1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF DELAWARE

3

4    WATERS TECHNOLOGIES          :    CA NO. 11-708-RGA

5    CORPORATION.                 :    August 3, 2012

6                                 :

7              Plaintiff,         :    9:00 O'clock a.m.

8                                 :

9    v.                           :

10                                :

11   AURORA SFC SYSTEMS INC.      :

12                                :

13             Defendant,         :

14   ............................

15

16

17              TRANSCRIPT OF MOTION TO STAY

18         BEFORE THE HONORABLE RICHARD G. ANDREWS

19              UNITED STATES DISTRICT JUDGE

20

21

22   APPEARANCES:

23

24   For Plaintiff:     MCCARTER & ENGLISH

25                      BY:  DANIEL M. SILVER, ESQ

```
1                            BY:  ERIK PAUL BELT, ESQ

2

3

4     For Defendant:       MORRIS, NICHOLS, ARSHT & TUNNELL

5                          BY:  MARY B. GRAHAM, ESQ

6                          BY:  JEREMY A. TIGAN, ESQ

7

8

9

10

11

12    Court Reporter:        LEONARD A. DIBBS

13                           Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2                        P R O C E E D I N G S

3

4          THE COURT:  Good morning.  Please be seated.

5          We're here for Waters Technologies vs Aurora, Civil

6    Action No. 11-708.

7          Mr. Silver, Mr. Belt, good morning.

8          MR. SILVER:  Good morning, your Honor.

9          MR. BELT:  Good morning.

10          MS. GRAHAM:  Good morning, your Honor.

11          THE COURT:  Is it Tegan or Tigan?

12          MR TIGAN:  Tigan.

13          THE COURT:  Mr. Tigan, good morning.

14          MR. TIGAN:  Good morning.

15          THE COURT:  What I thought was before hearing the

16    argument, I wanted to do two or more things that are more in the

17    nature of factual questions.

18          I want, Mr. Belt, Ms. Graham, if you are going to be

19    making the arguments, if you would both come forward.  I want to

20    have a dialogue before I have argument.

21          What's the current status with the Patent & Trademark

22    Office?

23          I saw some dockets not too long ago.  What's the

24    current status of both patents?

25          MR. BELT:  Both patents were put into reexamination,

1    your Honor.  The claims were canceled as would normally be the

2    case in the First Office Action.

3              Waters responded to the Office Action and then Aurora

4    puts in its reply.  This is inter partes.  Both parties get to

5    comment.  That's where it stands.

6              THE COURT:  One of the things that I'm interested in as

7    a factual matter, is this an amendment of the claims?

8              MR. BELT:  Yes, your Honor.

9              THE COURT:  And I got a different sense -- I didn't

10   understand because I think your brief said we added the word

11   and, and your brief said they added the differential pressure

12   transducer.  I'm not understanding something.

13             What's the story on that?

14             MR. BELT:  This was going to be part of my argument.

15   I'm happy to do it now.

16             I have an illustration that shows exactly what the

17   amendments were.  Would that be helpful to you?

18             THE COURT:  Just tell me in a sentence or two.

19             I saw somewhere in there an exhibit as to one patent,

20   where I saw the underlined and, and, and.

21             MS. GRAHAM:  That's the '767, your Honor.

22             THE COURT:  All right.

23             MS. GRAHAM:  Differential pressure transducer, that's

24   from the '609 patent.

25             THE COURT:  So the explanation is, in the one that

1    begins with the seven, you've added it in the word and here and

2    there.  And the other one, you amended to include differential

3    differential pressure transducer?

4            MR. BELT:  Yes.

5            MS. GRAHAM:  In addition, there are new claims added

6    in.

7            THE COURT:  Right.  I saw there were some new claims.

8    I guess what I'm getting at is, and maybe this is part of the

9    argument, I don't know the answer.  That's the reason why I'm

10   asking.

11           You could amend the claim -- just because you amend the

12   claim to put in the word and, that doesn't prevent you from

13   seeking damages or whatever they did, if they infringed prior to

14   that amendment, right?

15           MR. BELT:  There is a whole lot of law on this, your

16   Honor, and it has to do with whether the change is substantial

17   or not.  I suppose that will be briefed at some point.

18           THE COURT:  Okay.

19           Maybe I asked it slightly differently.  And, is that a

20   substantial enough amendment that you're going to be saying

21   later on, We're starting new from whenever that was added?

22           MS. GRAHAM:  I expect so, your Honor.

23           THE COURT:  Okay.

24           And I don't want argument here.  But the differential

25   pressure transducer, are you likely to be saying that that is

1   not a substantial change?

2          MR. BELT:  Right, your Honor.  Because that was already

3   in a dependent claim.  We brought it up into the independent

4   claim, and therefore, if they were to already have infringed the

5   dependent claim, I don't believe that that would be a

6   substantial change.

7          This is all in the evolving area of intervening rights.

8   And I know that it will be briefed at some point.

9          THE COURT:  And I respect that.  I was wondering if

10  there was a simple answer.

11         If it was clear now, that was not just something that

12  we need to address now.  But if it's the case, it is complex and

13  there may be some argument on both sides later on.

14         MS. GRAHAM:  Yes, your Honor.

15         With respect to that, we will argue that it's

16  substantial because it's not the case that Claim 1 necessarily

17  has the same scope as the Dependent Claim 4 from our

18  perspective.

19         THE COURT:  Without knowing the law at all, I expected

20  for sure that you would be saying regardless of what Mr. Belt

21  had to say about that one, I was not so sure about the and.

22  Just on the wedge deep on a mile deep issue, it looked fairly

23  administerial is not the right word.

24         MR. BELT:  Clerical.

25         THE COURT:  And I saw that your patent prosecution

1  counsel said clerical.  They probably said clerical no matter

2  what.

3          But that didn't strike me as implausible.  All right.

4          Isn't it the case that once you propose an amendment,

5  there's no going back?

6          In other words, let's say you do something with

7  differential pressure transducer, you put in the independent

8  claim, you do something, whatever, and the patent owner isn't

9  wild about that for one reason or another, can you then go back

10  to where you were before or are you sort of estopped from doing

11  that and we've moved on?

12          MR. BELT:  That a good question.  I do not know.  I can

13  find out for you if you think it's important.

14          My experience with re-exams over the years is that once

15  you put it in it sticks.

16          THE COURT:  That's kind of what I heard but only in a

17  very casual way.

18          MR. BELT:  Let me put it this way:  My guess would be

19  that if it -- lets's take the transducer element, if that

20  doesn't get you over the hump of the validity challenge, going

21  back to its original state probably isn't going to either.

22          My guess as a practical matter, it would be stick.

23          MS. GRAHAM:  Your Honor, also, the patent owner in its

24  response on the '609 indicated, it didn't even argue for the

25  validity of that claim in response to various obviousness or

1    anticipation arguments saying that the rejection was mooted by

2    the fact that they canceled the claim.

3           So given the estoppel effects from the whole

4    proceeding, they've essentially acknowledged the invalidity of

5    Claim 4 based on certain prior art.

6           THE COURT:  They are not defending the validity of

7    Claim 4.  I don't know if they have acknowledged invalidity.

8           MS. GRAHAM:  That's correct.  That's right, your Honor.

9    They said it's moot.  Right.

10          I think when you come out of -- the effect is, when you

11   come to the end of that proceeding, you have a determination by

12   the patent owner as to Claim 4.  The patent owner has not

13   contested that, and the result is that Claim 4 cannot survive.

14          THE COURT:  Okay.

15          And is it the case that as this goes on, the patent

16   owner, with response to whatever is happening, can amend claims

17   a second time?

18          MR. BELT:  I believe that's correct.  That's right,

19   your Honor.  I don't know that that would be done here.

20          THE COURT:  I'm just saying as a theoretical matter,

21   can they do it?

22          MR. BELT:  As a theoretical matter, that's right.

23      Under the new account you're only allowed to do it once.

24   Under the new procedures.  But that doesn't apply here.

25          MS. GRAHAM:  As I understand it, they could amend again

1   if the patent examiner issues another rejection as opposed to

2   going to final.

3          I'm not sure in this situation they go to final.  They

4   can.  There are certainly circumstances in which they can still

5   amend.

6          THE COURT:  In terms of where we are, I know Mr. Belt,

7   you said -- made the comment blah, blah, blah, we're the First

8   Office Action and the Second Office Action?

9          MR. BELT:  Correct.

10          THE COURT:  Okay.  After the Second Office Action, is

11   there more than one passage that you can go depending on what

12   the Second Office Action is?

13          MR. BELT:  Yes.

14          If the Second Office Action --

15          THE COURT:  Let's assume the Second Office Action says

16   all the amendments are great, we reject all the invalidity

17   challenges, what would be the next step after that?

18          MR. BELT:  In that case, I guess a notice of allowance

19   essentially.  Right now, the reexamination is in something

20   called the a CRU.  I forget what that stands for.

21          That stands for Central Reexam Unit.  That's the first

22   level.

23          It goes through this process.  There's the examination.

24   So let's says the examiner says, Okay.  Now with these

25   amendments and with these arguments these claims are good.  I'm

1    going to issue what is called a Notice of Intent to Issue a

2    Reexam Certificate.  That's essentially the equivalent of an

3    original examination, a Notice of Allowance.

4         And it may have reasons for the allowance.  It may say

5    something like, We like the arguments and here's why we think

6    these claims are now in good standing or it maybe silent on

7    that.

8         At that point, there's another period between that

9    period.  I think there is some quality control that happens by

10   senior management, so to speak.

11        And at that point, a reexam certificate could issue.

12   However, there's the chance that Aurora as the other party in

13   this case, could at that point ask for an appeal.

14        THE COURT:  Somewhere there's a possibility to the

15   Board of Patent Appeals?

16        MR. BELT:  Correct.

17        THE COURT:  All the way up to Federal Circuit?

18        MR. BELT:  Right.

19        THE COURT:  The other thing I was interested in sort of

20   as a factual matter, is the question of competition.

21        And as I understand it, what Aurora is saying is that

22   what we make, saying that Waters infringes the patents, is

23   essentially a component, that may not be the right word, a

24   subset, some kind of smaller part of product that Agilent,

25   sells.  Is that what you're saying.

1          MS. GRAHAM:  Essentially.  We would say it is an

2     accessory and that you add it on to the Agilent product.

3          THE COURT:  So there is no issue that Agilent, Waters

4     are direct competitors?

5          MS. GRAHAM:  I think that's clear.

6          MR. BELT:  I'm sorry.  I missed your question.  I

7     apologize, your Honor.

8          THE COURT:  Basically, the question is, is Agilent and

9     Waters direct competitors?

10          MR. BELT:  Yes, that would be our competition, your

11     Honor.  I can go into that.

12          THE COURT:  I take it there is no argument about that,

13     you agree?

14          MS. GRAHAM:  As a general matter, Waters and Agilent

15     are competitors along with the other four companies that we

16     mentioned in our papers.

17          THE COURT:  But the only use for the product, not the

18     only use, the use that is now being made of the product is only

19     with Agilent, not with the other four competitors, right?

20          MS. GRAHAM:  That's correct.

21          THE COURT:  And I saw something, which for lack of a

22     better word, I would say was, you were saying that Aurora's

23     product upgrades systems that are already in existence?

24          MS. GRAHAM:  Aurora system gets sold either -- there

25     can be a customer who already has an Agilent HPLC system and

1    Aurora could go to that customer or Agilent could go to that

2    existing Agilent customer and say, Hey, there is an accessory

3    that can upgrade your HPLC system to do SFC.

4         The other way the product gets into the market is that

5    Agilent goes to whoever and says, We'll sell you a system that

6    has an HPLC system that has the SFC capacity.

7         They sold a whole brand new system that has the Aurora

8    SFC capability.

9         THE COURT:  With Agilent selling that new system that

10   has the SFC capability, doesn't Waters have some sort of system

11   that it's selling that could be -- is in the same market?

12        MS. GRAHAM:  Well, your Honor, there's not a lot in the

13   record on that.

14        The affiant from Waters indicated that they had four --

15   they named four systems.  But they didn't say anything when they

16   were in the market, how many sales had actually be made.

17        Our affiant indicated that one of those you could just

18   forget, a parallel system.  Aurora is not being sold into people

19   who need it.  So it is a parallel system.

20        Our affiant indicated that two of those products -- I

21   think it was the method SFC and XFC, something like that.

22     It's our understanding that those essentially aren't being

23   sold because they are outmoded not rugged and people aren't

24   buying them.

25        Our affiant also indicated that there was a failed

1    system.  And that wasn't in the list that Waters had been trying

2    to sell.

3           To our knowledge they never were able to sell it and

4    only recently, and we don't know for sure, but it appears in the

5    last several months since March, they have actually come out

6    with their acuity system.  Now, whether they actually made any

7    sales of that, we don't know.

8           THE COURT:  The acuity system is something that would

9    compete?

10          MS. GRAHAM:  I believe so.

11          THE COURT:  Mr. Belt, along those lines, what do you

12   have to say?

13          MR. BELT:  So, your Honor, if I could use an analogy.

14          Let's say I sell a very expensive television set of

15   $10,000, but it projects everything in 3D without the need for

16   3D glasses and it's a really great experience for the viewer.

17   Let's say a competitor comes along and says, I have a $200

18   adapter that I can plug into your existing television set, or to

19   any TV set that you buy off-the-shelf and make that as good a

20   quality or the same as the $10,000 TV.

21          Well, if you're a consumer, you're going to buy the

22   $200 adapter and adapt your existing TV set rather than spend

23   the $10,000.

24          That's essentially our argument with respect to the

25   systems that we sell.  We sell a very high-end SFC system, which

1   is a very sophisticated kind of chromatography box.  And Aurora

2   sells the adapter essentially that allows an existing HPLC

3   system equivalent to say your standard off-the-shelf television

4   set to act the same as the much higher price had television set.

5           THE COURT:  Not to be unfair to either one of you, but

6   the general approach that waters is taking to this question of

7   competition, is sort of looking generally at the market for some

8   kind of chromatography.

9           And the approach that Aurora is taking is looking more

10  specifically -- is looking at product, bi-product?

11          MR. BELT:  That seems to be the argument, which is, yes,

12  Waters doesn't sell the adapter, but it sells the entire system,

13  that once you plug the adapter in, we're competing.

14          So if the customer, and we've named a number of

15  customers that we believe where we've loss sales, large

16  pharmaceutical companies.  Pfizer I think was one of the

17  companies that we've named.

18          THE COURT:  I don't think at this point in the

19  proceeding you have to be proving the loss sales.

20          MR. BELT:  No, that's for trial.

21          THE COURT:  You have to be proving essentially, you're

22  in the same market?

23          MR. BELT:  Yes, that would be our contention, your

24  Honor.

25          MS. GRAHAM:  I'd like to put a little different gloss

1    on that.  That is one of the things that we don't know from

2    their declarations because I couldn't ask our people.

3            THE COURT:  I saw that.

4            MS. GRAHAM:  I don't know whether the sales to Pfizer

5    or the sales, alleged loss sales to anyone else were because

6    Agilent was there selling a complete system or if it was the

7    case that the customer, let's say Pfizer had an existing HPLC

8    system and Aurora was able to convince it or Agilent was able to

9    convince it to buy an upgrade that is an accessory.

10           THE COURT:  You would agree that generally speaking,

11   there's a universe of need for certain kinds of chromatography

12   out there, and that if you are company that is biting off a

13   chunk of it, whether it is by accessory or by whole systems

14   where you are putting a part into it, your, you know, whatever

15   market share you're getting is decreasing the market share that

16   is available for everybody else out there?

17           MS. GRAHAM:  Respectfully, your Honor, I would not.

18   And the only evidence that comes on this is from our affiant.

19           If somebody has the existing $1,000 television set,

20   let's say it works okay, maybe it's three years old, 5 years

21   old, it's not time to get rid of it yet.  And you say especially

22   in this current market, people are not buying this equipment

23   very much, which is one of the interesting things in this

24   lawsuit.

25           Let's say you're a Pfizer, tough times.  You're not

1  spending a lot.  Your R&D lags.  And, by the way, these numbers

2  are not the numbers.

3          THE COURT:  Right, I understand.

4          MS. GRAHAM:  A thousand dollar piece of equipment, you

5  say, it works okay.  Remember, you can use HPLC to do what SFC

6  does.  You can absolutely use it for that as our affiant says.

7  It's a question of, I would like a somewhat better way to do

8  things.

9          So you say, I might buy this SFC accessory, which costs

10  less.  It's not like it cost the differential that he's talking

11  about.  It's actually a fairly substantial cost.  It's under

12  50,000, but it's not hugely under that as our affiant indicated.

13          As our affiant says, you're not going to then get this

14  customer, this Pfizer to buy a complete whole new system.  The

15  one that cost between in real numbers, between let's say 80, 90

16  and a 120 thousand.

17          Maybe down the road -- when you're talking about

18  replacement down the road, but not now.

19          THE COURT:  Let's say Pfizer is going to look at things

20  such as we have an adequate system, we spend a little bit of

21  money and make a state of the art system or we can buy a new one

22  and make it state of the art or we can keep moseying along with

23  the one we have.  And, between keeping moseying along with the

24  one we have and buying new state of the art, there is a $200 fix

25  to get the 3D, people might pay $200.  Pfizer might pay $200 to

1   get the 3D.

2         But let's assume that's an infringing product and

3   shouldn't actually be there, then they have a choice of moseying

4   along or buying a new one.  And Pfizer might mosey along and

5   then and GlaxoSmithKline might decide to buy the new one.  So

6   even in a depressed market by giving a low cost option to them,

7   the amounts are relatively the same, your still having an impact

8   on other people's ability to sell the $100,000 system?

9         MS. GRAHAM:  I understand that that would be an

10  argument.  But the only evidence in the record is from our

11  affiant, who said that he did not believe that customers, and we

12  can't go to any particular one and ask them, so it's all

13  theoretical.

14        THE COURT:  Right.

15        MS. GRAHAM:  And there are other competitors.

16        In the strongest case for them, all they can say is had

17  Aurora's SFC component accessory not been available, they might

18  have made a sale of SFC rather than the four other companies

19  selling SFC or somebody just buying a new HPLC system.

20        THE COURT:  I guess what it gets down to in the end for

21  this stage of the proceedings, I'm not sure that I have to be

22  finding kind of actual harm.  That might be something that's

23  talked about much later.

24        It seems to me to the extent that the case is talking

25  about competitors in the marketplace, they are talking about it

1    a lot more like Mr. Belt is talking about in a way other than

2    the way that you are talking about it.

3            In any event, let's do this:  I have one more question,

4    then I'll let you both make argument.

5            The other question is, in terms of discovery in this

6    case, I know we had the Rule 16 Conference a month ago or

7    whenever exactly it was, it wasn't even that long ago.

8            MR. BELT:  Three weeks ago.

9            THE COURT:  It wasn't very long ago.

10           I didn't check the docket.

11           Has anything happened in terms of the discovery world

12   since we said the Rule 16 Conference?

13           MR. BELT:  Your Honor, we've traded interrogatories and

14   document requests.  They are coming in about a week and a couple

15   of days.

16           THE COURT:  They were filed more or less right after?

17           MR. BELT:  I think the next day.

18           THE COURT:  All right.

19           MS. GRAHAM:  Ours were served shortly thereafter.

20           THE COURT:  In any event, they are out there.

21           Why don't I give you 10 minutes to make an argument.

22   It's your motion.  Why don't I give you ten minutes to make an

23   argument.  I'm going to give him ten minutes to respond, okay?

24           MS. GRAHAM:  Your Honor, I would agree that it's not

25   necessary to make the same degree of showing of harm for Waters.

1    I don't think one would be conducting necessarily the

2    equivalent of a preliminary injunction hearing in the context of

3    a stay motion.  However, the cases do note that where someone

4    has not sought a Preliminary Injunction, that's something the

5    Court can take into account, because it reflects on how serious

6    does this patent owner really think the threat is.

7    THE COURT:  Don't you think, and I'm not going to

8    disagree with case law, but it seems -- how many preliminary

9    injunctions are sought in the District of Delaware every year in

10   patent cases?

11   MS. GRAHAM:  I certainly don't know the number, but

12   they are sought.

13   THE COURT:  They are not sought very frequently.

14   MS. GRAHAM:  Many of the cases that we have, of course,

15   are brought by non-practicing entities.

16   THE COURT:  Understandable.

17   MS. GRAHAM:  I certainly have been involved in

18   Preliminary Injunction hearings.

19   I don't suggest that that's anything.  It's an

20   indicator.  It tells you something about how serious the threat

21   really is.

22   The second thing I would say is that, in any event,

23   they should have to present something more than just the

24   conclusory declarations of two sales people who say, We've lost

25   sales or potential sales.

1          With all due respect, I would suggest that's not

2    something that is compelling.

3          The third point, and this wraps in throughout really

4    all of the factors and the one that your Honor was addressing

5    with the first set of questions, and that is what is going on in

6    the reexam?  What is really the status of the claims?  Could, in

7    fact, Waters pursue claims of infringement against Aurora based

8    on the claims, the original claims as they existed when the case

9    was filed?

10         And we would submit that is absolutely not the case.

11   Those claims are gone.  They couldn't tomorrow ask the Court for

12   judgment against Aurora on those original claims.  They are not

13   there.

14         So first, they can't claim harm for not being able to

15   pursue claims that they gave up.  And they have given up these

16   claims in the reexamination.

17         And second of all, where that leaves us in the case is

18   essentially if the Court were to proceed with the litigation,

19   we'd be going forward with essentially a form of pre-litigation

20   discovery and exercise.

21         Well, let's have Aurora produce tons of documents.

22   And, of course, their document requests are very broad.  And the

23   burden of discovery in this case falls largely on Aurora and not

24   Waters, because Waters did, they only acquired these patents.

25         And we go through what would truly be an exercise until

1    such time as there were claims that the Court would actually be

2    empowered to construe.

3         THE COURT:  I'm sorry.  One of the other things I

4    should have done and I like to do, in terms of construction, the

5    joint claim construction chart or the first meet-and-confer on

6    what that chart is going to be, what's the approximate Rule 16

7    Conference date for that?

8         MR. BELT:  March.

9         MS. GRAHAM:  Claim construction briefing starts on

10   April 4th and the claim construction issue identification starts

11   on March 1 of 2013.

12        THE COURT:  Thank you.

13        MS. GRAHAM:  Your honor, so with respect to harm for

14   Waters, as the Southwire case put it, how can there be harm to a

15   patent owner who has in effect given up their patent claims.

16   There can't be harm to them in not being able to pursue that.

17        I would like to pursue something more.  I know your

18   Honor has often reflected on, in effect, the policy implications

19   and how to look at these cases in terms of various interests.

20        And what we have here is, we have a parallel

21   proceeding, the reexamination.  That reexamination is inter

22   partes which as the Court knows, that means that both parties

23   participate.

24        But very importantly, the outcome of that reexamination

25   proceeding with respect to section 102 and Section 103 validity,

1    is that the parties will be bound by that.

2         So this isn't Aurora getting to have its cake and eat

3    it too.  Aurora has invested in that and realizes that it would

4    need to live with that.

5         THE COURT:  Is Aurora bound by all conceivable 102, 103

6    defenses or just the ones they actually raise in the inter

7    partes proceeding?

8         MS. GRAHAM:  I believe for the most part, if not

9    entirely, they would be bound.  I'm not sure if there is any

10   exception for some.  They are bound as I understand it by any

11   art that was in the reexamination proceeding, or that they could

12   have brought into the proceeding.

13        So for practical purposes, we're assuming that we're

14   bound by this.

15        And, in fact, one of the things that Aurora has spent

16   substantial time doing was looking carefully for prior art and

17   making sure that after doing a substantial search -- by the way,

18   this was art that the inventors -- it was not before the patent

19   office, at least the inventors that were with Aurora did not

20   know of.  So that was a very careful and substantial effort on

21   our part.

22        And moreover, more importantly in this reexamination,

23   this does distinguish it from many.

24        Waters is not simply being a defendant in that

25   reexamination.  It's not like, Okay, let's keep these original

1    claims.  We'll add one.  We're going to stick with the original

2    claims.  That's what we're here for and we'll defend our

3    validity.

4           They are using this proceeding to hone their patent.

5    They are trying to improve the validity of the claims.  And I

6    assume they are trying to do it while still emerging with claims

7    that they can assert against Aurora.

8           And I'd like to address in particular the so-called

9    clerical amendment to add and.

10          First of all, there's no exception in the patent world

11   for quote clerical unquote changes.  That doesn't have any

12   particular meaning.

13          Waters made that change obviously for a reason.  And

14   undoubtedly, it thought because it enhanced the claim perhaps

15   because of Section 112 issues, whether the claim was vague,

16   whether they thought before it could mean and or or, but in any

17   event, they elected to make that amendment.

18          And the other day Judge Thynge made a comment in

19   another case where a party had come in with quote minor unquote

20   changes shortly before trial.  And she made a comment that I

21   thought was very apt.

22          She said, You patent lawyers had taught me really well

23   and I've learned.  You'll change to an ah or a the and then

24   you'll drive a Mack truck through the differences.

25          In the patent world adding an and is a significant

1  change, and they must have done you the for that reason.

2       And no claim exists in its original form.  We would

3  submit that the Court should take into account that Waters is,

4  in fact, using that proceeding to enhance its position.  And it,

5  in effect, wants to have it's cake and eat it too.

6       He wants to be able to change the patents in the reexam

7  and all the while have Aurora go forward in having to produce

8  documents, answering interrogatories in an exercise so that when

9  ultimately there is a patent that the Court might construe,

10  which it can't do right now, it will be in a position presumably

11  to take that patent and use it, if it can, and consider it then.

12       We would suggest that the Court should consider that.

13  And, in addition, while the word gets thrown around a fair

14  amount in these cases that Congress reflected a policy to favor

15  these proceedings as a cost effective and an expeditious way to

16  address patents issues, that is particularly true in this case

17  given that Aurora is small.  It doesn't have the resources to be

18  doing two proceedings or to be doing this litigation at all.

19  And this vehicle is available.

20       And Congress moreover has, in fact, gone to something

21  that we haven't seen what will happen yet with it.  It enacted

22  the new patent review procedure, I think it's called.  Where at

23  least as to new patents, if a defendant files that proceeding

24  similar to the reexam, there will be a mandatory stay in the

25  District Court of litigation unless the filer agrees otherwise.

1          So the world is moving to favoring having the Patent

2    Office, and I would point out that my reexam counsel pointed

3    this out to me, that in the reexam setting, the Patent Office

4    assigns only very experienced examiners.  Apparently a contrast

5    to the ordinary prosecution, at least in the inter partes

6    setting.

7          So we have that benefit here, your Honor.  We would

8    suggest that we should wait and defer to the Patent Office.

9          THE COURT:  The provision about the planned inter

10   partes review, that's part of the American Invents Act?

11          MS. GRAHAM:  Correct.

12          THE COURT:  Do you have the citation for that?

13          MS. GRAHAM:  I can get that for your Honor.  I might

14   have that here.

15          THE COURT:  I understand it doesn't apply to this

16   because this case was filed before the American Invents Act.

17          MS. GRAHAM:  I can get the cite for that, your Honor.

18   I'm not sure that I have it handy.

19          THE COURT:  But what you say is that the American

20   Invents Act -- just tell me what the provision says, roughly.

21          MS. GRAHAM:  Roughly, as I understand it, I'm not sure

22   which patent it applies to.  I believe it's the new patent.

23   That within a period of time after the patent issues, I believe,

24   it might be 9 months after, a party can file for this review.

25          THE COURT:  It's tied to their actually being

1    litigation in existence?

2            MS. GRAHAM:  I don't believe so, your Honor.  But if

3    there is, there's an automatic stay unless the filer agrees

4    otherwise.

5            And that is the important in that it reflects Congress'

6    view that it wants to have the Patent Office deciding -- really,

7    getting the patent right before it's litigated.

8            THE COURT:  Right.  Before it's litigated.  That does

9    seem like a fairly narrow proceeding, because it's got to be

10   within 9 months of the patent being issued?

11           MS. GRAHAM:  I think it's the other way.  It's after 9

12   months.  I don't think you have to do it within 9 months.

13           I don't want to speak, you know, incorrectly on that.

14           The point is, your Honor, that's really the way the

15   world is moving.  And the Patent Office has set up the time in

16   which it's paying attention to these inter partes reexams.

17           That's reflected in this case.  We've moved along very

18   quickly.  The next thing is in the '767.  The examiner has to

19   act.  That's all ready for the examiner to act.

20           And next week Aurora has to file its reply to Waters'

21   response in the '609.  That proceeding was about a month behind.

22   And it is staying roughly a month behind.  And it will then be

23   ready, I think, after August 9th for the Patent Office to render

24   its decision in this case.

25           That's really expeditious, your Honor.  And unless your

1    Honor has other questions.

2              THE COURT:  Thank you.   Mr. Belt?

3              MR. BELT:  Thank you, your Honor.   Good morning.

4              Your Honor, I'd like to start with the legal framework,

5    if I may?

6              THE COURT:  Yes.

7              MR. BELT:  It says exception to the rule.

8              About 3 years ago, Judge Newman in the Federal Circuit

9    in the Fresenius case said, If routinely available to delay the

10   judicial resolution of disputes, the reexamination procedure is

11   subject to inequity, if not manipulation and abuse, through the

12   delays that are inherent in PTO activity.

13             I think what she was concerned with, your Honor, is

14   that increasingly the Motion to Stay pending reexam has became a

15   tactic to slow down or to stop litigation and stop patent owners

16   from enforcing their rights.

17             And whereas once it was conceived of as a way to have

18   the Patent Office just take a second look, now it has become

19   part of a defense tactic, and that was the concern of not Judge

20   Newman, but in other cases that we've cited to you.

21             Aurora has the burden here of showing that it is

22   entitled to a stay and that we will not be prejudiced.

23             And the factors that courts typically consider, as you

24   know, is whether a stay would prejudice the non-moving party,

25   whether a stay will simplify the issues for trial and whether

1    discovery is complete and a trial date is set.

2            And the most important factor, I think as you latched

3    on to with your preliminary questions is prejudice to the

4    non-moving party.

5            And in this case, we have put in three declarations of

6    Mr. Lipper, Burns, Sidhu that we believe that we have lost sales

7    to the accused product.

8            THE COURT:  Sidhu, he's not a salesman?

9            MR. BELT:  He's General Manger of the business unit.

10   But we have the two field guys who are out in the field.

11           THE COURT:  And I saw the field guys declarations.  I'm

12   just trying to think when I saw the Sidhu thing.  It is not

13   ringing any bells.

14           MR. BELT:  I don't think we refiled it.  We put it in

15   in the context of the Motion For the Continuance and to Stay

16   Discovery --

17           THE COURT:  Okay.

18           MR. BELT:  -- where they were trying to stop the Rule

19   16 Conference.  And we just recited to it.

20           You have the two two field guys who are saying, We're

21   out in the field.  These are the guys that are walking in the

22   door --

23           THE COURT:  They are sales people.

24           MR. BELT:  -- as the sales guys for the competition are

25   walking out the door.

1          Again, your Honor, you're right.  This is a preliminary

2     proceeding.  We could have just made a theoretical argument at

3     this point that we are in competition.  But we have presented

4     some hard evidence.

5          And, of course, Aurora will be able to tell us that in

6     discovery and take their depositions if they choose.  And that

7     will be for trial about whether we, in fact, did lose sales.

8       But for now, we certainly have the evidence that we have,

9     that we believe that we are losing not just a little sales, but

10    some substantial sales.

11         And we've given you the numbers in those declarations.

12         Before I put that on the record, I see we have someone

13    in the back.

14         THE COURT:  He works for the Court.

15         MR. BELT:  We're all under the presumptive Protective

16    Order.

17         THE COURT:  No, no, this actually this is a public

18    proceeding where there is probably going to be a transcript of

19    this.

20         If you say something, it will be available for public

21    consumption.

22         MR. BELT:  I won't reveal confidential information at

23    this time.  Thank you, your Honor.

24         I've given you the TV set analogy, which I think holds

25    here.  This is why we think if any consumer has a choice of

1    between spending more money if they need to do SFC or buying a

2    less expensive option.  And it's not just that it's a less

3    expensive option, it's the less expensive option that, for

4    instance, that's what we say the patent covers.  That is an

5    adapter kit, in essence.

6            So, that's the issue there.

7            THE COURT:  Actually, I don't think he works for the

8    Court.  I don't know who he is.

9            MR. BELT:  There's been some briefing on alleged

10   prejudice to Aurora that it's a small company, that it can't

11   afford this litigation.

12           And I guess what I would say to you there if it were

13   the case that a defendant could come into court and say, You

14   have to stop this because we can't afford it, then that would

15   set a dangerous precedent, then any small company or start up

16   could copy the big boys or copy the innovators, and when they

17   get sued and say -- throw up their hands and say, Oh, no, you

18   can't case sue me, wait ten years until I've made some money,

19   meanwhile I will have eroded your market share.

20           That's why I think that argument shouldn't be given too

21   much credence.

22           And, in any event, some of the pain here, some of the

23   financial pain is self-inflicted.  Aurora has hired two law

24   firms; one for litigation and another one to do the reexam, lots

25   of motion practice, dilatory tactics that we listed for you,

1    your Honor.  And the choice to fight on two fronts.  And as to

2    that point, I note --

3              THE COURT:  It seems like their choice to fight on two

4    fronts, trying to move from the more expensive front to the less

5    expensive front?

6              MR. BELT:  Yes.  But at the end of the day, I think the

7    statistics reveal that these claims will come out of

8    reexamination.  I'll get to that in a minute.

9              And they will be forced to come back in here, whether

10   it's now or whether it is several years from now.

11             THE COURT:  In fact, do you agree with Ms. Graham that

12   pretty much because inter partes, whatever section, 102, 103

13   defenses there are, are going to be resolved by this?

14             MR. BELT:  No, I don't.

15             What the statute says is that they will be estopped.

16             Let's say we've made a reexam.  They will be estopped

17   from asserting any prior art that was in the reexam or that they

18   should have known about and put into the reexam.

19             But that wouldn't stop them from, for example, 102(b)

20   prior art, the prior sale, public use, that was not a printed

21   publication.

22             Reexam is limited to a very narrow range of validity,

23   which is printed publications and patents.

24             THE COURT:  If they knew about prior sales as opposed

25   to prior art, which is out there for the public to find.

1          Let's say for one reason or another that they knew

2     about prior sales because maybe they worked for your company,

3     would they be estopped from -- do they have to bring that up to

4     the Patent Office or waive it?

5          MR. BELT:  They can't bring that up at the Patent

6     Office.  The Patent Office won't consider it.  The Patent Office

7     will only consider by statute patents and printed publications

8     for the purpose of the reexam.

9          So they will also have the 112 type of validity

10    arguments, enablement, written description, indefiniteness, and

11    the non-patent or publication types of prior art defenses.  So

12    there's not a complete overlap.

13         THE COURT: All right.  Thank you.

14         MR. BELT:  Just on that point.  Aurora says that we're

15    using the reexam to in effect clean up our patent.  Of course,

16    don't forget, the reexam was forced upon us.  We didn't choose

17    it.

18         THE COURT:  I heard Aurora say that.

19         I think the point was that maybe the reexam, the

20    process can be beneficial to both sides.  If there was some

21    other point there, I didn't get it.

22         MR. BELT:  If I had the choice, we would do it all here

23    in Court.

24         THE COURT:  I understand that, too.

25         MR. BELT:  One of the factors that you may consider,

1  your Honor, is the stage of the litigation.

2       Now, we're relatively early in this litigation.  Of

3  course, we say some of that has been engineered by the dilatory

4  tactics of defendant.

5       THE COURT:  I don't think actually it makes any

6  difference.  It doesn't make a whole lot of difference as to how

7  we got to this point in terms of where we are in the litigation.

8  We are where we are in the litigation, you know, which is pretty

9  early.

10       MR. BELT:  That's true.  It has made a difference, your

11  Honor, in some of the cases that we cited such as the Prestige

12  Jewelry case where the Court said, Wait a minute, they are early

13  in the litigation, but that was because the other side had been

14  stalling.

15       THE COURT:  And as far as that goes, to me it's a wash

16  for whatever reason the Complaint wasn't served right away.

17  There have been quite a few defense motions of one kind or

18  another.

19       To the extent there's equity being balanced here, they

20  are close enough to level the case.  So that's a wash.

21       MR. BELT:  Right.

22       What I was going to end up by saying, your Honor, but

23  we're here.  We're not down the road, obviously.  But we also

24  have to compare that with not just the stage of this litigation,

25  but also the stage of the reexam.

1        And I would contend that the stage of the reexam is

2   also relatively early in the process and the statistics that we

3   have given you.  And the case law agrees with this, is that

4   inter partes reexams typically take 3 years from start to

5   finish.

6        THE COURT:  The critical part of the reexam, isn't

7   really -- maybe I'm not saying it right, isn't really so much

8   the tail end of appeals and appeals.  It's really, isn't it, do

9   you, you know, is Waters amending any of the claims?  Does it

10  come out of the Patent Office with some of -- comes out of the

11  Patent Office with everything being viable and now we've just

12  got Aurora trying to, you know, basically saying obvious or

13  anticipated or whatever they might be saying, that's kind of a

14  difference stage -- at least there's a fixed target --

15       One of the things that is of concern to me is, and part

16  of the reason why I was asking when the claim construction sort

17  of begins, it seems very wasteful if the parties and me are

18  starting to construe claims on a moving target.

19       Once the target kind of settles down, you know, there's

20  a certain, it could be the case before I did something that

21  somebody in that hierarchy could say, We reversed the patent

22  examiner.  All the claims are invalid.  The case over.  Sorry

23  you all wasted your time in court.

24       But we're at the point where things are very fluid from

25  the Patent Office.  At least, you know, the parties and me

1    spending time when the Patent Office can do things to change the

2    target that are completely not things that I could -- anybody

3    could undue.

4           MR. BELT:  Let ne address that in two ways, your Honor.

5           First is according to Aurora's time schedule, this is

6    going to be over in six to eight months, which will be right

7    about the time that we start the claim construction.  Now, I

8    think it's going to take a lot longer.

9           If I may go to the board?

10          THE COURT:  Yes.

11          MR. BELT:  I have copies if the Court would like?

12          THE COURT:  Sure.

13          MR. BELT:  I've given one to co-counsel.

14          THE COURT:  All right.  What are these?

15          MR. BELT:  This is just the amendments which we've

16   blown up.

17          Here, your Honor is the '767 patent.  Here is Claim 1.

18   Of course, we did just stick in and.  I think that was implicit

19   any way.  You always have to have all of these claim elements

20   met.

21          Of course, what we did say here are highlighted.  That

22   was to address the clerical error, no new matter has been added.

23   I would doubt very strongly that is going to become a point of a

24   claim construction argument.

25          THE COURT:  I assume that it's the case, you both have

1    patent prosecution, patent counsel who are doing this?  You're

2    not also doing the proceedings in front of the Patent Office?

3            MR. BELT:  That's right, your Honor.  We have a partner

4    who is doing that.

5            MS. GRAHAM:  Morris Nichols does not have anyone that

6    does patent reexams.  It's being handled by a small one person

7    firm.

8            THE COURT:  I was just wondering if it is just a

9    clerical error, do you know why -- any reason you care to tell

10   me as to why you bothered to make that amendment?

11           MR. BELT:  I don't know because I wasn't participating

12   in that.

13           THE COURT:  Okay.  Fair enough.

14           MR. BELT:  The other one is the transducer one.  So

15   essentially what was added here was taking what was in a

16   dependent claim, Claim 4 and essentially sticking it up into the

17   independent claim, Claim 1.

18           We believe when we did our preliminary investigation,

19   we got the unit as we've alleged, that they would have infringed

20   Claim 4 in any event.  And those claims, which were already

21   existing in the patent would have needed to be construed in any

22   event.

23           So it's not as if this is really such a moving target,

24   your Honor, where claims -- there are new terms that are being

25   added, for example.  These are claims that were existing in the

1    patent and would have needed construction in any event.

2         I think it would be not impossible but unusual for

3    there to be another round of amendments.

4         THE COURT:  All right.

5         MR. BELT:  So that is all I have to say about that.

6      And the last thing I have to say about the reexam, your

7    Honor, is the only expert would who has spoken up in the reexam

8    has been Dr. Troidia (phonetic), who has been in the field for a

9    long time.  And he is of the opinion that the patents that were

10   asserted here were either far afield -- they were not in the

11   chromatography or SFC field in any event.  So they don't really

12   address the problems of this patent, or they lack one or more

13   limitations.  We've given you those declarations.

14        Another interesting thing that Dr. Troidia says is, he

15   knows the inventors.  He said they never said anything about the

16   invalidity of the patent. And I just think it's curious.

17        THE COURT:  There are a lot of curious things.  I'm

18   trying to restrain myself from being curious about things that

19   are not actually before me.

20        And generally speaking, you know, what Dr. Trodia says

21   and swears to, because I'm not construing claims now, because I

22   don't have the background.  I'm not in a position to make any

23   kind of reasonable judgment, or even, you know, only slightly

24   more than arbitrary judgment as to what's going on in the Patent

25   Office.

1         As far as I'm concerned, that's an issue for me for
2    another day.
3         MR. BELT:  We're not asking you to look into the
4    crystal ball and say that the Patent Office is definitely going
5    to rule one way or the other.
6         I think the point of that is just to show that Waters
7    does believe that there's going to be a good result here.
8         THE COURT:  You believe there will be a good result.  I
9    believe Ms. Graham believes there will be a good result for
10   Aurora.
11        MR. BELT:  I just have to question that, your Honor.
12        When the inventors sold the Berger instruments the
13   business first to Tharr (phonetic) and then eventually to Waters
14   and the patents that came with it, I don't think there was a
15   representation that these patents were problematic.
16        I don't think that Tharr (ph)would have paid several
17   million dollars as you've seen in the closing documents for a
18   business where the patents are no good.
19        THE COURT:  That's part of -- I don't think this is
20   something that we're going to be getting into.
21        I presume part of what Aurora did during whatever
22   period of time they were getting their reexam or requests
23   together was perhaps something that goes beyond the due
24   diligence when one company buys a set of patents from another
25   company.  I don't know.  That would be my assumption.

1          Assuming that Aurora's personnel, the people who

2    invented these patents, doesn't mean that the patents are valid

3    and it doesn't mean they are invalid either, right?

4          MR. BELT:  True.  I think it's just suspicious that the

5    inventors would try to sink their own patents have after having

6    sold them and now only when they are on the receiving end.

7          I guess if I could conclude, your Honor?

8          I just want to read to you from the Cooper Notification

9    case, which was a Judge Robinson case in this Court.

10         And that seemed to have a very similar procedural

11   posture.  And Judge Robinson notes that, this conclusion.  She

12   denied a stay in this case.

13         It's all more compelling in the Court's view given the

14   even earlier stage of the reexamination.  The PTO only just

15   granted defendant's request for reexamination about three weeks

16   ago, at which time, it also issued an Office Action rejecting

17   all of the claims of the '428 patent.

18         So, this was a case that was in a relatively similar

19   procedural posture to this case.  It was early in the case, but

20   also the reexam was relatively early.  All the claims were

21   rejected there, and yet for that and other reasons, the Court

22   still denied the stay.

23         THE COURT:  And I assume one difference between this

24   case and that case, one could argue about whether it's

25   significant or not, the fact that you amended your claims?

1           MR. BELT:  Right.

2           THE COURT:  One of the things about Cooper Notification

3   and some other cases is, we are at the stage that the Patent

4   Office has rejected the claims.  There is still a pretty decent

5   chance that their final decision will be to affirm the claims

6   and it will show up again just as they used to be.  Where as

7   here, maybe the amendments that have been made, maybe it doesn't

8   make any difference.  There has been a change in circumstances

9   that's pretty much irreversible already.

10          MR. BELT:  Right.  But we have it already.  In other

11  words, there is not some theoretical significant revision coming

12  ahead.

13          And what I would say to this, your Honor, while the

14  revisions to the claims may help with respect to the validity

15  argument within the Patent Office, I don't believe they affect

16  the infringement analysis and the claim construction analysis,

17  because they are terms in there anyway that would need to be

18  construed.

19          In conclusion, your Honor, let me bring you back again

20  to where I began, which is that we are competitors here.  And

21  this is the case regardless of what the damages are, it's really

22  about also getting an injunction to stop the infringement, to

23  stop the erosion of price and the erosion of market share and to

24  prevent Waters from potentially, whether it's a year in Aurora's

25  analysis or 3 years according to the statistics in the case law

1  of being able to -- not being able to enforce its patents is, I

2  think very serious.

3          And that's why we would be against the stay.

4          THE COURT:  Ms. Graham, if have you got something to

5  say, you have two minutes.

6          MS. GRAHAM:  Yes, your Honor.  One is with respect to

7  the competition, your Honor.

8          The analogy with respect to the television set.  He's

9  assuming that Aurora could come into anybody with a HPLC system

10  and sell it.  I think your Honor knows that's not true.  So it's

11  portion of the market out there that could be impacted as to

12  which there are many other competitors also.

13          With respect to the impact on the case and claim

14  construction, your Honor asked about discovery when claim

15  construction starts, I would point out that there's a very

16  important earlier proceeding, which goes to their assertion

17  which comes on August 13th.  So in ten days, when they have to

18  serve disclosure asserted claims on us, which then triggers us

19  to produce the documents to them, what claims are they going to

20  assert?

21          THE COURT:  He might find out in a few days.

22          MS. GRAHAM:  He might.  That's right.  He might find

23  out they could either be ones that don't exist and they should

24  not be asserting or they are going to say -- will assert these

25  claims in the Patent Office if these claims should issue.

1          THE COURT:  I'm guessing that Mr. Belt is going to

2     assert the claims as amended, right?

3          MR. BELT:  Yes, your Honor.  And I guess to that, I

4     would say the Federal Circuit says these claims remain valid and

5     enforceable throughout the proceedings.

6          THE COURT:  When you say these claims, what are you

7     referring to?

8          MR. BELT:  What the Federal Circuit typically says is

9     that claims in reexamination, even ones that are going through

10    amendment remain valid and enforceable in the Court.

11         THE COURT:  Right.  In other words, when you do

12    infringement contentions, you're going to say -- you're going to

13    use the '609 patent, Claim 1, independent claim as amended as

14    the basis for your infringement?

15         MR. BELT:  Yes.  This is not a shell game, your Honor.

16    We're going to be change it.

17         THE COURT:  Right.  In any event, that's what I

18    thought.

19         MS. GRAHAM:  Your Honor, but that points out how

20    hypothetical this is.  To conduct a patent proceeding in a

21    Federal District Court on hypothetical claims that have no legal

22    standing, I would submit is completely improper.

23         They can't come back with the original ones.  He's

24    saying here they won't.  They can't, because they gave them up

25    as distinguished from a proceeding in which the Patent Office

1   rejected them and the patent owner maintains them, maybe amends

2   other claims.

3            Finally, with respect to the estoppel effect, your

4   Honor.  It's completely hypothetical and extremely unlikely that

5   there will be prior sales, prior art in that as far as we know

6   no one has every used these inventions.  Certainly, no one has

7   ever said that they've used these.

8            I can tell you that the inventors are not aware, at

9   least the inventors that are at Aurora, are not aware of any

10  prior sale.  And they certainly never used these.

11           So, obviously, I would say that the reexamination

12  proceeding is (a) going to determine what claims could actually

13  go forward when this case could go forward on real claims.

14           And (b), that it's going to significantly, if there are

15  claims that come out, we will have a different scope.  We'll

16  have claim construction issues that have been reflected upon and

17  the parties addressed in reexamination proceeding including the

18  important terms like the CCC, the constant compression --

19  whatever it is.  I always forget that one as well as other

20  terms.

21           We would submit that the Court should defer to that

22  proceeding.

23           THE COURT:  All right.  Thank you.

24           I did read the briefing before coming into Court.  I

25  thought it was a fairly close case upon reading the briefing and

1   having heard the parties.  I still think it's a pretty close

2   case and, you know, we to have the three factors, which have

3   been set forth many times before, that a court in considering a

4   stay is suppose to consider one, whether a stay would simplify

5   issues at trials, two, whether discovery is complete and the

6   trial date is set, and three, whether granting a stay would

7   cause the non-moving party to suffer undue prejudice from any

8   delay.

9        And when I consider these factors in relation to the

10  briefing and what the parties have said this morning, I do

11  believe that there would be some simplification of issues at

12  trial, because the inter partes reexams nature of the

13  proceedings in front of the Patent Office will in one way or

14  another bind Aurora on maybe some most relevant Section 102, 103

15  defenses.

16       I think positively we can say right now Aurora on

17  anticipation and obviousness, which obviousness seems to be the

18  most likely defense in most cases and one that is usually the

19  most complicated.

20       So I think there is some prospect that a stay will

21  simplify the issues at trial.

22       In terms of whether discovery is complete and the trial

23  date is set.  The record is clear that discovery is just

24  beginning.  There is a trial date that is set.  I don't recall

25  specifically, but I guess it's about two years from now.

1          And so, on the whole, I think that factor favors the

2     granting of a stay, too, because essentially the trial date

3     being set is two years in the future and not particularly a big

4     deal.

5          Discovery itself -- and the discovery, while the

6     interrogatories and requests for production have been exchanged,

7     presumably, the parties are working on answering them.  Really,

8     not much has happened.  And the rest of case claim construction,

9     experts and the like is well down the road.

10          And the third factor, which is really, I think it's the

11     first case I've had where I would say based on the record and

12     the argument that, I think the parties are competitors.

13          Waters Technologies certainly has products that it's

14     trying to sell.  It's hard for me to -- I don't think I'm in a

15     good position to say that I'm convinced that Waters Technologies

16     is losing sales as a fact.

17          But I certainly think there is a likelihood that Waters

18     is losing business, because as I understand it, the Aurora

19     product that is accused does compete in the same market with the

20     Waters' product and, therefore, it just seems to me -- and is

21     being sold and therefore, that seems to be that would create a

22     corresponding decrease in the demand for the Waters' product.

23          And I understand they may not be apples and apples.  I

24     don't think they are apples and oranges either.

25          So I think that factor favors granting a stay.  And I

1    guess you could go further and say that in the end trying to

2    figure out whether two years from now or some other time in the

3    future trying to figure out whether or not what exactly Waters

4    Technologies has lost, if the case is stayed, might be fairly --

5    certainly subject to a lot of argument and might indeed be

6    pretty hard to establish.

7         I don't think every salesman that -- sales person that

8    Waters has is going to be deposed to get their anecdotal

9    accounts of sales that they think they lost.

10        So, I'm pretty torn here, because even though I don't

11   think Aurora it its particular circumstance of being a smaller

12   company, doesn't have the capitalization, 30 employees,

13   relatively new in the market, I don't think that independently

14   enters into the balancing.

15        I think things like that maybe part of reason why inter

16   partes reexams procedures exist in the first place is because

17   patent litigation is just expensive.  And so, Waters can

18   presumably bear the course of patent litigation better than

19   Aurora.

20        So you do have alternative avenues such as the reexam.

21   And the Aurora argument is internally consistent that they are

22   trying to have a cost effective way of, I guess, litigating this

23   case, because most of the reexam requests I see are ex-parte.

24   So that the party who filed the reexam is giving up nothing.

25        Aurora has committed itself, it's my understanding,

1   that it would really prefer to have the Patent & Trademark

2   Office decide the 102, 103 issues, probably not only more

3   competent than me, but they are cheaper than me.

4         And I am concerned, which maybe fits into the issue

5   about the stay simplifying the issues at trial.  I am concerned

6   about -- strike that.

7         In any event, when I think about these things all

8   together -- I guess there is one other thing to say.

9         As far as I can see, I think sometimes there's a

10   suggestion, in fact, I would always see the suggestion that the

11   party that is requesting the reexam, they didn't do it at the

12   right time.  If they didn't do it at the right time, they didn't

13   make the request for the stay at the right time.  And there are

14   cases where the party is only doing it at the wrong time, two

15   weeks before trial.

16         I'm not saying that Aurora did it in the perfect time.

17   I think Aurora has made the request at a reasonable time and in

18   a reasonable manner and the request for a stay before me made at

19   a reasonable time in the proceedings.

20         I mean, after all, the motion was filed before we had

21   the Rule 16 Conference.

22         So I don't think Aurora has -- I'm not going to comment

23   on -- I think the objective indicators are that Aurora has done

24   it the right way notwithstanding the fact that it seems to me

25   that the overall balance, in my opinion, does favor Waters,

1    because I think there is competition between the two parties

2    here.

3             So I'm not going to grant the stay.  And as I said, I

4    think it is a very close decision.  So I'm not going to grant

5    the stay.

6             I would like the parties sometime -- I'm not going to

7    set a -- actually, I will set a specific date.  Let's say

8    February 1st of 2013.  I would like the parties to advise me by

9    letter, a joint letter as to what's happening or happened in the

10   Patent and Trademark Office.

11            I realize this is not accomplishing -- at least not

12   Aurora's first choice.  But depending on what is going in the

13   Patent and Trademark Office, I'm not adverse reconsidering this

14   at a later time, because things can change.

15            And so, the reason why I'm asking for this February 1st

16   submission is so that if nothing happens before then, I would

17   just like to see before basically going into the claim

18   construction exercise, that there hasn't been some material

19   change of circumstances that, I'm not going to sua sponte

20   reconsider this.

21            I would just like to see what happens.  If around that

22   time, in Aurora's opinion, or the parties opinion, depending on

23   what happens, it could be both of you, might want to both do

24   something different than what you want today.

25            So, in any event, if there is some change that causes

1    either one of you or both you want to do something different,

2    feel free to bring it to my attention, all right?

3                MS. GRAHAM:  Yes, your Honor.

4                Aurora had been obviously not expecting a stay, but had

5    hoped for a stay, and therefore, we have not, in fact, invested

6    in the substantial effort to undertake responses to their

7    discovery.  And we would ask for a 30 day extension in order to

8    be able to respond to that discovery?

9                THE COURT:  Discovery was served on you when?

10               MR. BELT:  July 12th.

11               THE COURT:  July 12th, does that sound about right?

12               MS. GRAHAM:  Yes, July 12th, your Honor.

13               And as I mentioned before, the discovery is

14   substantial.  There are 68 document requests that cover, if on

15   their face --

16               THE COURT:  Let's not turn this into a discovery

17   argument.

18               Mr. Belt, you heard the request.  Do you have any brief

19   comment?

20               MR. BELT:  I think maybe the better way to do it would

21   be offline.  But we are not adverse to giving an extension as

22   long as it's mutual.

23               THE COURT:  A reasonable response.

24               Why don't the two of you talk to each other.  I think

25   reasonable people could work this out without anything further

1    needed from me.

2            MS. GRAHAM:  Thank you.

3            THE COURT:  All right.  Thank you.  I will enter a very

4    brief order.

5            We'll stand in recess.

6            (At this time, the hearing concluded)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25